UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VERONICA ANNE LAFAYETTE

                Plaintiff,        Civil Action No. 14-10004
                                     Honorable Patrick J. Duggan
                                     Magistrate Judge David R. Grand
v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 10]**

Plaintiff Veronica Anne Lafayette ("Lafayette") brings this action pursuant to 42 U.S.C. §405(g), challenging the portion of a final decision of Defendant Commissioner of Social Security ("Commissioner"), which denied entirely her application for Disability Insurance Benefits ("DIB"), and which denied in part her application for Supplemental Security Income ("SSI"), under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [9, 10], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Lafayette was not disabled under the Act prior to September 30, 2010 (the date she was last insured for DIB) is not supported by substantial evidence, and that Lafayette has established her entitlement to an award of benefits. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [10] be DENIED, Lafayette's Motion for Summary Judgment [9] be GRANTED, and that, pursuant to sentence

four of 42 U.S.C. §405(g), the ALJ's decisions adverse to Lafayette's applications for DIB and SSI be REVERSED, and this case be REMANDED for an award of benefits consistent with this Recommendation.

## II. REPORT

### A. Procedural History

On April 4, 2011, Lafayette filed applications for DIB and SSI, alleging disability beginning on April 1, 2007.[1] (Tr. 173-86). These claims were denied initially on August 5, 2011. (Tr. 120-28). Thereafter, Lafayette filed a timely request for an administrative hearing, which was held on June 7, 2012, before ALJ Regina Sobrino. (Tr. 38-69). Lafayette (represented by attorney David Stewart) testified at the hearing, as did vocational expert Pauline McEachin. (*Id.*). On October 12, 2012, the ALJ found that Lafayette did not establish that she was disabled prior to September 30, 2010 (the date she was last insured for DIB). (Tr. 23-33). However, the ALJ did find that Lafayette was disabled beginning on July 1, 2011, and awarded her SSI benefits as of that date. (*Id.*). On November 6, 2013, the Appeals Council denied review of the adverse portions of the ALJ's ruling. (Tr. 1-5). Lafayette filed for judicial review of the final decision on January 2, 2014. (Doc. #1).

### B. Background

#### 1. *Disability Reports*

In an undated disability report, Lafayette indicated that her ability to work is limited by dyslexia, anxiety, depression, and back and leg pain. (Tr. 201). Lafayette completed eighth grade, but had no further schooling. (Tr. 202). Previously, she worked as a dishwasher, on an

---

[1] Lafayette previously applied for DIB and SSI, alleging the same disability onset date of April 1, 2007. (Tr. 23). On May 5, 2010, ALJ Patrick Nagle issued a written decision concluding that Lafayette was not disabled. (Tr. 73-83). The Appeals Council denied review (Tr. 117-19), and, thus, the prior decision is administratively final. The unadjudicated period begins, then, on May 6, 2010. (Tr. 23).

2

assembly line, at a dry cleaner's, and as a cashier, but she claims she became unable to work because of her conditions on April 1, 2007. (Tr. 201-02). She reported treating with several doctors and therapists regarding her medical conditions and taking numerous medications (both for pain and for her mental impairments). (Tr. 204-07).

In a function report dated May 6, 2011, Lafayette reported that she lives in a house with her family. (Tr. 211). She indicated that she is in constant pain, and her mental disabilities limit her activities. (*Id.*). She also indicated that she is able to do very light housework (i.e., taking dishes to the kitchen), but her son helps with cooking, laundry, and caring for her cat. (Tr. 212). She has no problems with personal care but needs reminders to take her medication. (Tr. 212-13). She is able to ride in a car, but she cannot drive because she experiences "shooting pain" when she applies the gas or brake pedals. (Tr. 214). She is able to shop for groceries once a month, spend time with family, and pay bills, count change, and handle a savings account. (Tr. 214-15). Her hobbies include knitting and watching television. (Tr. 215).

When asked to identify functions impacted by her condition, Lafayette checked lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, understanding, and following instructions. (Tr. 216). She has trouble paying attention, does not finish what she starts, and does not read very well. (*Id.*).

    2.  *Lafayette's Hearing Testimony*

At the June 7, 2012, hearing before the ALJ, Lafayette testified that she lives in a house with her mother. (Tr. 41-42). She dropped out of school in the ninth grade and can read very little because she is dyslexic. (Tr. 42). While in school, she took primarily special education classes. (Tr. 53-54).

Lafayette further testified that she can no longer work because of back and leg pain, as

well as depression. (Tr. 42-43, 50). She has undergone two back surgeries and wears a back brace. (Tr. 43). She tried both pain management (injections) and physical therapy, but neither helped. (Tr. 54). She spends most of her time sitting in a recliner or lying in bed. (Tr. 49). She can stand for only fifteen minutes, walk for only ten to fifteen minutes, and sit for only fifteen minutes at a time, and she cannot lift more than ten pounds. (Tr. 43-44, 49). She also has difficulty using her hands, reaching, bending, and crouching, and she does "not use stairs whatsoever." (Tr. 44-45). Lafayette further testified that, since her first back surgery, she has not performed household chores (such as cooking, cleaning, laundry, yard work, or grocery shopping). (Tr. 45-46). She can bathe herself but has trouble getting dressed. (Tr. 46). She tries to drive very short distances, but her leg "shakes so bad" that it is unsafe (and her doctors have advised against it). (Tr. 46-47). Lafayette further testified that the medications she takes make her "a little drowsy." (Tr. 47).

Lafayette also testified that there are days when she does not get out of bed because of her depression. (Tr. 50). She also has angry outbursts and does not leave the house at all because she cannot be out in public. (Tr. 50-51). She has nightmares and panic attacks and physically attacked her mother during one such episode. (Tr. 51). She has difficulty sleeping (because of pain), experiences racing thoughts, and her memory is "not good at all." (Tr. 52-53).

### 3.  *Medical Evidence*

The record contains a substantial amount of medical documentation regarding Lafayette's physical and mental impairments. As set forth below, however, the Court finds that the ALJ's error in evaluating Lafayette's mental impairments warrants remand and an award of benefits; consequently, the Court will focus primarily on the medical evidence related to her mental impairments, and will discuss evidence pertaining to her physical impairments only to the extent

necessary to provide context.

Lafayette first injured her back in 2007, when she was assaulted and dragged down a set of stairs by her ex-husband. (Tr. 261). On July 9, 2008, on the recommendation of Dr. Jawad Shah, Lafayette underwent a minimally invasive right-sided L4-L5 decompression with medical facetectomy and discectomy. (Tr. 478-79). Pedicle screws were placed at L4-L5 bilaterally. (*Id.*). Lafayette continued to follow up with Dr. Shah over the course of the next eighteen months, during which time her pain persisted and he diagnosed her with post-laminectomy syndrome. (Tr. 469-77). By June 2010, Dr. Shah was telling Lafayette that there were "not any great options" for her pain; ultimately, he recommended a second surgery (an anterior lumbar interbody fusion, with a Somafor Danek Cage at L4-L5), which was performed in November 2010. (Tr. 250-51, 465-77). Unfortunately, Lafayette's back pain continued to persist after this second surgery.[2] (Tr. 460-62).

In addition to this ongoing back pain – culminating in two less-than-successful spinal surgeries – the record reflects a history of difficult events that have taken a severe emotional toll on Lafayette. She reported having been sexually abused by her brother, and physically and emotionally abused by her ex-husband. (Tr. 292). In 2000, her six-year-old daughter was shot and killed by a classmate while in school. (Tr. 276). Her third husband, who also was emotionally abusive, was in prison during the relevant time period. (Tr. 292).

The record indicates that during the relevant period, Lafayette consistently attempted to address her mental health needs. She presented to New Passages for mental health treatment in October 2009 and was diagnosed with major depressive disorder. (Tr. 432). At a medication

---

[2] On May 8, 2012, Lafayette's primary care physician, Dr. Roome, completed a Medical Source Statement in which he opined that Lafayette could lift less than ten pounds; stand and/or walk less than two hours in an eight-hour workday; required a sit/stand option; could never climb, kneel, crouch, crawl, or stoop; and was limited in reaching. (Tr. 766-69).

5

review in January 2010, Lafayette's diagnoses were modified to include bipolar disorder, as well as major depressive disorder, and her Global Assessment of Functioning ("GAF")[3] score was 45. (Tr. 349). Lafayette continued to treat at New Passages regularly throughout 2010; her diagnoses remained the same, and her GAF scores ranged from 42 to 45. (Tr. 365, 375, 381, 387, 392, 397). On April 16, 2010, Lafayette reported that she was "still moody & irritable" and "[s]napping at people." (Tr. 332). On May 13, 2010, she was complaining of anxiety and asking to increase her dosage of Vistaril. (Tr. 380). Similarly, at visits on August 12, 2010, and September 27, 2010, she asked for changes in her Vistaril and Buspar because they were not helping. (Tr. 386, 391).

Lafayette continued to treat at New Passages throughout most of 2011. On January 10, 2011, she indicated that she and her mother had gotten into a "big fight." (Tr. 322). The next month, she continued to report irritability, mood swings, and arguing with her son. (Tr. 309). In April, she indicated that none of her medications were working; she was drinking alcohol and buying Xanax off the streets. (Tr. 283). In July 2011, Lafayette indicated that she was still irritable and arguing with family members "to the point of fist fights." (Tr. 278). Between August 2010 and July 2011, her diagnoses remained the same and her GAF score consistently was 45. (Tr. 279, 302, 310, 387, 392, 452). On August 1, 2011, Lafayette reported that Dr. Roome, her primary care physician, had prescribed a brief course of Klonopin, which helped her "deal with [her] mom and not argue so much." (Tr. 415). She apparently saw him again, requesting an increased dose of Klonopin, saying that she was fighting with her family members and having outbursts. (Tr. 635). The next week, she reported throwing a shoe at her mother and

---

[3] GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

indicated that she needed something "to calm her down." (Tr. 632). Dr. Roome adjusted her medications – taking her off Klonopin and Abilify and starting her on Seroquel and Alprazolam – and indicated that she should return in one week. (Tr. 632-33). At visits in August and October 2011, Lafayette reported that her anxiety was somewhat improved. (Tr. 625, 629).

On April 16, 2012, Lafayette underwent a psychosocial assessment at New Passages.[4] (Tr. 833-50). On May 3, 2012, she reported that she had been off her medication and was "going nuts." (Tr. 808). Her diagnoses remained major depressive disorder and bipolar disorder, and her GAF score was 50. (Tr. 813). On May 7, 2012, Dr. Magoon, a psychiatrist at New Passages, completed a Medical Source Statement, in which he opined that Lafayette was markedly limited in the ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions. (Tr. 761). He further indicated that she was markedly limited in her ability to interact appropriately with the public, supervisors, and coworkers, and to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 762).

### 4. *Vocational Expert's Testimony*

Pauline McEachin testified as an independent vocational expert ("VE") at the administrative hearing before the ALJ. (Tr. 60-61). In her Vocational Analysis, the VE characterized Lafayette's past relevant work as light and unskilled. (Tr. 231). The ALJ asked the VE to imagine a claimant of Lafayette's age, education, and work experience, who could perform sedentary work, with the following additional limitations: the opportunity to alternate sitting and standing at will; no climbing of ladders or stairs; occasional stooping; no kneeling,

---

[4] At that time, it was indicated that Lafayette was last seen at New Passages on January 18, 2012, and had been discharged in February 2012. (Tr. 850). In the meantime, Dr. Roome apparently was prescribing medications for Lafayette's mental impairments, but she felt she was not responding to Seroquel and returned to New Passages for additional support. (Tr. 834).

7

crouching, or crawling; no reaching above shoulder level; frequent handling, fingering, feeling, and reaching in other directions; no exposure to hazards or vibration; no use of foot or leg controls; able to wear a back brace while working; and limited only to simple, routine, repetitive, and low stress work (no fast paced work, no work that involves quotas, and no assembly line work) that does not involve interacting with the public, or more than occasional and routine interactions with coworkers and supervisors. (Tr. 62-65). The VE testified that the hypothetical individual would not be capable of performing Lafayette's past relevant work. (Tr. 63-65). However, the VE testified that the hypothetical individual would be capable of working in the positions of visual inspector (1,800 jobs in Michigan's lower peninsula), surveillance system monitor (2,000 jobs), and order checker (1,500 jobs). (Tr. 64-65).

### C.     Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months,

8

> and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that, prior to July 1, 2011, Lafayette was not disabled under the Act. At Step One, the ALJ found that Lafayette has not engaged in substantial gainful activity since May 6, 2010, the first day of the unadjudicated period. (Tr. 26). At Step Two, the ALJ found that Lafayette has the severe impairments of degenerative disc disease, affective disorder, and substance abuse addiction disorder (reported to be in remission). (*Id.*). At Step Three, the ALJ found that, since May 6, 2010, none of Lafayette's severe impairments meet or medically equal a listed impairment. (*Id.*).

The ALJ then assessed Lafayette's residual functional capacity ("RFC"), concluding that, prior to July 1, 2011, Lafayette was capable of performing sedentary work, with the following additional limitations: the opportunity to alternate sitting and standing at will; no climbing of ladders or stairs; occasional stooping; no kneeling, crouching, or crawling; no reaching above

9

shoulder level; frequent handling, fingering, feeling, and reaching in other directions; no exposure to hazards or vibration; no use of foot or leg controls; able to wear a back brace while working; and limited only to simple, routine, repetitive, and low stress work (no fast paced work, no work that involves quotas, and no assembly line work) that does not involve interacting with the public, or more than occasional and routine interactions with coworkers and supervisors. (Tr. 26-29). Beginning on July 1, 2011, however, the ALJ determined that, as a result of her inability to "respond appropriately to supervision, co-workers and usual work situations," and to "deal with changes in a routine work setting," Lafayette has been markedly impaired in the ability to maintain social functioning. (Tr. 30-32).

At Step Four, the ALJ determined that, since the first day of the unadjudicated period, Lafayette has been unable to perform her past relevant work. (Tr. 30). At Step Five, the ALJ concluded, based in part on the VE's testimony, that, prior to July 1, 2011, Lafayette was capable of performing a significant number of jobs that exist in the national economy; after July 1, 2011, however, this was not the case. (Tr. 31-32). As a result, the ALJ concluded that Lafayette "was not disabled prior to July 1, 2011, but became disabled on that date and has continued to be disabled through the date of this decision." (Tr. 32).[5]

### E. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the

---

[5] The ALJ also noted her duty to determine whether Lafayette's substance abuse was a contributing factor material to the determination of disability. (Tr. 32 (citing 20 CFR §§404.1535 and 416.935)). After reviewing the record evidence, the ALJ concluded that although Lafayette had been diagnosed with a substance addiction disorder, no medical source had identified limitations caused solely by substance addition since July 2011. (*Id.*). Consequently, the ALJ concluded that Lafayette's substance abuse disorder was not a contributing factor material to the determination of disability. (*Id.*). Neither party has challenged this finding.

Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can

consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F. Analysis**

1. *Determination of Onset Date after a Finding of Disability Has Been Made*

Given the ALJ's determination that Lafayette was disabled, the Court's analysis of the instant dispute is guided largely by Social Security Ruling ("SSR") 83-20 – "Onset of Disability." SSR 83-20 provides in pertinent part:

> In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available. When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.

Moreover, "when a claimant suffers from a chronic and long-standing condition, medical findings and conditions subsequent to the onset of disability are probative of the medical condition existing prior to that time." *Garland v. Shalala*, 1996 WL 99809, at * 9 (6th Cir. Mar. 5, 1996) (citing *Ellis v. Schweicker*, 739 F.2d 245, 247 (6th Cir. 1984)). In determining the disability onset date, "it is improper to base [the] decision on one single piece of evidence and to disregard other pertinent evidence." *Id.* (citing *Hephner v. Matthews*, 574 F.2d 359, 362 (6th Cir. 1978)). Because of the substantive rights that might be impacted by the onset date determination, the applicable ruling emphasizes that "it is essential that the onset date be correctly established and supported by the evidence…" SSR 83-20. Against that backdrop, the

Court turns to Lafayette's claimed error with the ALJ's determination that she was disabled as of July 1, 2011, but not any time prior.

> 2. *The ALJ's Determination that Lafayette Was Disabled on July 1, 2011, But Not Prior to that Date, Runs Afoul of SSR 83-20 and Is Not Supported by Substantial Evidence*

As noted above, SSR 83-20 provides that once a finding of disability is made, "the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record." "[T]he date alleged by the individual should be used if it is consistent with all the evidence available." *Id.* Based on a review of the entire record, the Court agrees with Lafayette that the ALJ's determination of her onset date is not supported by substantial evidence.

In her decision, the ALJ concluded that, since July 1, 2011, Lafayette has been "unable to respond appropriately to supervision, co-workers and usual work situations; and has been unable to deal with changes in a routine work setting," such that she has been disabled under the Act. (Tr. 30-32). Neither Lafayette nor the Commissioner challenges this finding, and it is supported by the substantial evidence discussed herein. Assuming, then, that the evidence presented to the ALJ establishes that Lafayette was disabled at least as of July 1, 2011, the fundamental question is whether, under SSR 83-20, the ALJ properly rejected Lafayette's alleged onset date as the actual date on which her disability commenced.

In support of her conclusion that Lafayette became disabled on July 1, 2011, the ALJ opined that, beginning on that date, "[Lafayette's] allegations regarding her psychological symptoms and limitations are generally credible." (Tr. 30). The ALJ also found that the medical evidence from July 2011 to August 2012 established disability during this period, but not before. (*Id.*). As set forth below, however, the distinction drawn by the ALJ between Lafayette's condition before and after July 1, 2011, is not supported by substantial evidence.

13

As an initial matter, in concluding that Lafayette was disabled as of July 1, 2011, the ALJ specifically found that, beginning on that date, her allegations regarding her symptoms and limitations were "generally credible." (Tr. 30). Prior to that date, however, the ALJ apparently found Lafayette's allegations of disability less than fully credible, primarily because of statements she made in her May 6, 2011 Function Report, wherein she indicated that she was able to care for her personal needs, perform "very light housework," grocery shop, handle her own finances, knit, watch television, and spend time with family members. (Tr. 29 (citing Tr. 212-15)). The Court notes, however, that Lafayette did not complete this Function Report herself. (Tr. 218). Moreover, Lafayette testified at the administrative hearing (held on June 7, 2012, which was *after* she was deemed disabled) that she continued to perform some of these activities from time to time (including caring for her own personal needs, knitting, watching television, and spending time with family). (Tr. 46, 50). Finally, in crediting the May 2011 function report's assertion that Lafayette spent time with family members as a basis for finding Lafayette less than credible for the period prior to July 2011 (Tr. 29), the ALJ ignored treatment notes between April 2010 and February 2011 which indicate that Lafayette had ongoing significant difficulty during that period getting along with others, including her family members. *See infra*, p. 15. Thus, the Court finds that the ALJ's determination as to Lafayette's credibility prior to July 1, 2011, is not supported by substantial evidence.

More importantly, however, the ALJ's determination of Lafayette's onset date is not consistent with the medical evidence. In concluding that Lafayette's disability began on July 1, 2011, the ALJ cited to several treatment notes from July 2011 to August 2012 as evidence that, during that time period, Lafayette was unable to respond appropriately to supervision, co-workers, and usual work situations, or to deal with changes in a routine work setting. (Tr. 30

14

(Lafayette reported "increased irritability and fights with family members" in July 2011 (Tr. 278); she had aggressive "outbursts" in August 2011 (Tr. 635); she was "not responding" to medication and was "not sleeping" in April 2012 (Tr. 834); her GAF score was 50 in May 2012, and she had racing thoughts, mood shifts, and irritability (Tr. 808, 813); her GAF score was 49 in June 2012 (Tr. 825); and her GAF score was 50 in August 2012 and she was "doing quite well after one outburst" (Tr. 829, 831)).

The problem, however, is that treatment notes from May 2010 to June 2011 – the period *before* the ALJ found Lafayette disabled – paint a strikingly similar picture (and, indeed, in some respects suggest even greater difficulties). For example, on April 16, 2010, Lafayette reported that she was "still moody & irritable" and "[s]napping at people." (Tr. 332). On May 13, 2010, Lafayette complained of anxiety and asked for an increased dosage of Vistaril. (Tr. 380). At her next visit to New Passages, on August 12, 2010, Lafayette again complained of anxiety and indicated that Vistaril was not working. (Tr. 386). Her medication was changed to Buspar, but at her next visit, on September 27, 2010, she indicated that this was not helping either. (Tr. 391). Following her second back surgery (in November 2010), Lafayette returned to New Passages, saying that she and her mother had gotten into a "big fight" and she was worried about ending up homeless. (Tr. 322). The next month, she continued to report irritability, mood swings, and arguing with her son. (Tr. 309). In February 2011, her doctor assessed her as having "moderate to high" risk "due to depression," which appears to relate at least in part to attempts by Lafayette to harm herself. (Tr. 298-300). In April 2011, she indicated that none of her medications were working; she was drinking alcohol and buying Xanax off the streets. (Tr. 283). In other words, between May 2010 and July 2011, Lafayette repeatedly complained of anxiety, expressed concern that her medications were not working, reported difficulty interacting with family

15

members, and was found to pose a moderate to high risk to herself. Moreover, during this period of time, her diagnoses remained the same (major depressive disorder and bipolar disorder) and her GAF score ranged from 42 to 45.[6] (Tr. 279, 302, 310, 381, 387, 392, 397, 452). Thus, the ALJ's determination as to Lafayette's alleged onset date is not supported by the relevant treatment notes.[7]

Finally, in concluding that Lafayette became disabled on July 1, 2011, the ALJ explicitly considered the May 2012 opinion of Dr. Magoon, Lafayette's treating psychiatrist, that Lafayette was markedly limited in the ability to understand and remember complex instructions; carry out complex instructions; make judgments on complex work-related decisions; interact appropriately with the public, supervisors, and coworkers; and respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 29-30 (citing 761-62)). Specifically, the ALJ gave "significant weight" to this opinion, but only "as it pertains to the period since the established onset of disability." (Tr. 30). However, the ALJ also stated: "As to opinion evidence, there is no treating source opinion that addresses the period already adjudicated. [Dr. Magoon's opinion] pertain[s] to the period after the established onset of disability." (Tr. 29). Thus, it appears that the ALJ rejected Dr. Magoon's opinion – at least as it pertained to Lafayette's condition prior to July 1, 2011. Lafayette argues that the ALJ erred in this respect.

---

[6] Lafayette's GAF scores actually improved marginally after July 2011, climbing as high as 49 in June 2012 and 50 in August 2012. (Tr. 825, 831).

[7] In discussing Lafayette's New Passages treatment notes from visits prior to July 2011, the ALJ noted that "mental status examinations reflect that the claimant was alert and oriented to person, place and time. Her speech was clear, her mood was neutral, and her affect was appropriate." (Tr. 28). Presumably, then, the ALJ considered these facts in rejecting an onset date prior to July 1, 2011. However, the same observations were made at visits *after* the onset date as determined by the ALJ. Thus, those earlier treatment notes do not help explain the ALJ's onset date determination. (Tr. 278, 842).

Under the applicable regulations, an ALJ must give a treating physician's[8] opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. §404.1527(d)(2)). If an ALJ declines to give a treating physician's opinion controlling weight, she must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. §404.1527(d)(2). In addition, and particularly relevant here, the treating source rule contains a procedural, explanatory requirement that an ALJ give "good reasons" for the weight given a treating source opinion. *See Wilson v. Comm'r of Soc. Sec.*, 2012 WL 6737766, at *8 (E.D. Mich. Nov. 19, 2012).

In this case, the ALJ merely asserts, without any analysis, that Dr. Magoon's opinion pertains only "to the period after the established onset of disability." (Tr. 29). The Commissioner argues that the ALJ's assertion in this respect was correct because Dr. Magoon "wrote the opinion well after the onset of Plaintiff's disability, and there is no indication that he meant the opinion to be retrospective." (Doc. #10 at 14). The problem is that the opposite is also true: there is no indication that Dr. Magoon intended to limit his opinion in scope to the date on which it was issued (or to some other earlier point in time).[9] Moreover, one would

---

[8] It appears that the ALJ implicitly recognized that Dr. Magoon is a "treating source" within the meaning of the applicable regulations (Tr. 29), and the Commissioner does not argue otherwise.

[9] Moreover, the Commissioner appears to believe the opinion was "retrospective" to some

17

suppose that, in completing the Medical Source Statement, Dr. Magoon had Lafayette's entire file available to him and that his opinion was based not only on his interaction with her, but on her entire history at New Passages. *See, e.g., Puckett v. Comm'r of Soc. Sec.*, 2011 WL 4366665, at *3 (S.D. Ohio Sept. 19, 2011) (psychiatrist who saw the claimant infrequently due to the fact that the claimant "was forced to receive his health care from a free-clinic type facility where physicians come and go with greater frequency than in a privately run facility" should not be penalized for that, and the psychiatrist's access to earlier treatment notes from the facility qualified him to render a treating source opinion).

In short, the ALJ did not give "good reasons" for partially rejecting Dr. Magoon's opinion. Her determination that Dr. Magoon's opinion covered the time period from July 2011 to May 2012, but not before that – despite the fact that Lafayette was treating at New Passages during this entire period of time – is simply inexplicable. Thus, her reliance on Dr. Magoon's opinion to support a July 2011 disability onset date is not supported by substantial evidence. Instead, the ALJ should have used Lafayette's alleged onset date (May 6, 2010), because, as discussed above, it was consistent with the medical evidence in the record. *See* SSR 83-20.

### 3. *Remand for an Award of Benefits is Appropriate*

With Lafayette having already been adjudged "disabled," and this Court having found that the ALJ should have used Lafayette's alleged onset date of May 6, 2010, the Court recommends remanding this case back to the ALJ for an award of benefits using that alleged onset date. *See Faucher v. Sec. of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994) (it is proper to immediately award benefits if all essential factual issues have been resolved and the

---

degree, as she does not challenge the ALJ's conclusion – based at least in part on Dr. Magoon's opinion – that Lafayette was disabled as of July 1, 2011.

18

record adequately establishes the plaintiff's entitlement to benefits).[10]

### III. CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [10] be DENIED, Lafayette's Motion for Summary Judgment [9] be GRANTED, the ALJ's decisions adverse to Lafayette's applications for DIB and SSI be REVERSED, and this case be REMANDED for an award of benefits consistent with this Report and Recommendation.

Dated: February 11, 2015      s/David R. Grand
Ann Arbor, Michigan      DAVID R. GRAND
     United States Magistrate Judge

### NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

---

[10] Because the Court finds that remand is appropriate for an award of benefits consistent with a May 6, 2010 onset date, it need not address the remaining arguments advanced by Lafayette.

**CERTIFICATE OF SERVICE**

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 11, 2015.

                                            s/Eddrey O. Butts
                                            EDDREY O. BUTTS
                                            Case Manager